**STATE of Iowa, Appellee,**

v.

**Tracy Allan McGREW, Appellant.**

No. 92–499.

Supreme Court of Iowa.

April 20, 1994.

Linda Del Gallo, State Appellate Defender, and Andi S. Lipman, Asst. State Appellate Defender, for appellant.

Bonnie J. Campbell, Atty. Gen., Julie Halligan Brown, Asst. Atty. Gen., John Sarcone, County Atty., and Daniel Voogt, Asst. County Atty., for appellant.

Considered by CARTER, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

SNELL, Justice.

## I. *Introduction.*

Tracy McGrew, defendant, appeals from his conviction for first-degree kidnapping. Iowa Code §§ 710.1–.2 (1991). The State charged McGrew with first-degree kidnapping, first-degree burglary, and escape from custody. A jury found McGrew guilty on all three counts. The district court sentenced McGrew to life imprisonment on the kidnapping charge.

McGrew appealed from his kidnapping conviction. The court of appeals affirmed McGrew's conviction. We granted McGrew's request for further review. On review, McGrew asserts the district court erred in failing to grant his motion for directed verdict based on an insufficiency of evidence to support his kidnapping conviction. We affirm.

## II. *Standard of Review.*

When reviewing criminal convictions for insufficiency of evidence, this court reviews evidence in a light most favorable to the state. *State v. LaPointe*, 418 N.W.2d 49, 51 (Iowa 1988). We will reverse a criminal

conviction only if there is no substantial evidence in the record supporting the verdict or the verdict is clearly against the weight of the evidence. *Id.* Substantial evidence means evidence that could convince a rational trier of fact that the defendant is guilty of the crime charged beyond a reasonable doubt. *Id.* A fair inference of guilt with respect to each element of the crime charged is sufficient to uphold a verdict. *Id.* However, we will not uphold a verdict on evidence that merely raises suspicion, speculation, or conjecture regarding the defendant's guilt. *Id.*

### III. *Facts.*

In the early morning of June 20, 1991, McGrew broke into Kristin Horning's West Des Moines home. McGrew entered Horning's bedroom and awoke her by placing his hand over her face and mouth. He gagged her by forcing what Horning believed to be tape into her mouth. He asked Horning what time her alarm clock would ring in the morning. She signalled to him 6:30 a.m. He then told Horning to spit out the wad of tape in her mouth. McGrew tied Horning's hands behind her back and placed tape around her mouth, head, and neck. He forced her out of bed and pushed her toward her bathroom. He forced her to kneel in the bathroom doorway. He then told her to get up and led her into the hallway outside her bedroom. He led her down the stairway, but then turned her around and forced her back into her bedroom. McGrew forced Horning to lie on her back with her hands tied behind her back. McGrew touched Horning with a cold, steel object and asked her, "Do you know what this is?" McGrew then cut off Horning's T-shirt and underwear and sexually abused her.

After sexually abusing her, McGrew got up from the bed, smoked a cigarette, and peered out Horning's bedroom window. After a short while, McGrew sexually abused Horning a second time. He then took off the tape from Horning's face and wrists, and gave her underwear and a T-shirt to wear. He also gave her a pillow and covered her with a blanket while she lay in a fetal position on the bed. Horning remembers McGrew getting up from the bed, walking around her bedroom, and sitting back down on her bed at least thirty different times while she lay awake. During this time she heard McGrew searching through her drawers and closets. She heard him write something. She then fell asleep. Throughout the entire ordeal Horning kept her eyes closed. She has no idea what time McGrew awoke her or how long the traumatic ordeal lasted.

The next thing Horning remembers is waking up to the sound of her television set. "Good Morning America" was on and the time was announced to be 8:15 a.m. The man who sexually abused her was still lying next to her asleep. Too scared to move, she continued to lie on her bed. Her phone rang several times—messages were left on the answering machine. The doorbell rang—she did not move. Finally, she gained the courage to call out to McGrew to determine if he was awake. When he did not answer, she carefully and quietly escaped.

Horning ran outside and came upon a neighbor who let her into her house and called the police. The neighbor testified that Horning arrived at her door sometime between 10:30 and 10:45 a.m.

The police arrested McGrew at Horning's residence. Found in Horning's bedroom were a pair of women's underwear cut on both sides at the seams, a pair of panty hose that were snipped and tied in a knot, a loaded shotgun, an "X–Acto" knife, and two handwritten notes, the first of which read:

> I'm sorry for what I'm writing about and not showing up for court. I'm not so sure what to say but this was the best way out for Kris and I. I met her at the Hub Tower etc. ... I just can't go back to prison and all the stuff that's been said about me is pretty off the wall. I love you my family—Ray, Jason, Mom and Grama. Don't take my actions personal. I just needed to get out of it all, I feel like it's best for all.

> T. McGrew

The second note found in Horning's bedroom read:

Sorry but I loved him.

Kris

IV. *Discussion of Law.*

Kidnapping is defined as follows by Iowa Code section 710.1:

A person commits kidnapping when the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

. . . .

3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

First-degree kidnapping occurs "when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse." Iowa Code § 710.2.

 A defendant "confines" another person in violation of our kidnapping statute only if the confinement definitely exceeds the confinement that is an inherent incident of the underlying felony. *State v. Rich,* 305 N.W.2d 739, 745 (Iowa 1981). No minimum period of confinement is required to convict a defendant of kidnapping. *Id.* Rather, the confinement must be significantly independent of the confinement incident to the commission of the underlying crime. *Id.* Such confinement may exist if it substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the commission of the underlying offense. *Id.* The rationale behind the "incidental rule" arises from our recognition that confinement of a victim, against the victim's will, is frequently an attendant circumstance in the commission of many other crimes, notably robbery and sexual abuse. *State v. Mead,* 318 N.W.2d 440, 445 (Iowa 1982); *see* Natalie A. Kanellis, Note, *Kidnapping in Iowa: Movements Incidental to Sexual Abuse,* 67 Iowa L.Rev. 773, 780 (1982) [hereinafter Kanellis]. We did not and do not believe the legislature intended to afford prosecutors the option of bootstrapping convictions for kidnapping,

carrying life sentences, on to charges for crimes for which the legislature provides much less severe penalties. *Rich,* 305 N.W.2d at 745. In our decisions since *Rich,* we have adhered to the "incidental rule" analysis. *See State v. Hatter,* 414 N.W.2d 333, 338 (Iowa 1987); *State v. Newman,* 326 N.W.2d 796, 801 (Iowa 1982); *Mead,* 318 N.W.2d at 443–45; *State v. Marr,* 316 N.W.2d 176, 178 (Iowa 1982); *State v. Knupp,* 310 N.W.2d 179, 182 (Iowa 1981).

V. *Contentions of the Parties.*

The State contends McGrew's confinement of Horning exceeded the confinement incident to the sexual abuse offenses committed. The State argues the confinement substantially increased the risk of harm to Horning. According to the State, the presence of a knife, McGrew's loaded shotgun in the room, and McGrew's continued presence in Horning's bedroom after the sexual abuse substantially increased the risk of harm to Horning. Moreover, the State points out that McGrew's presence in the room with these weapons forced Horning to make a daring escape. Finally, the State contends the time and location of the offenses significantly lowered McGrew's risk of detection.

McGrew contends his confinement of Horning did not exceed the confinement incident to the commission of the sexual abuse offenses. McGrew asserts there is no evidence he detained Horning longer than the time necessary to commit the sexual abuse itself.

VI. *Analysis.*

 We believe ample evidence exists in this record from which a rational trier of fact could conclude that the confinement of Horning exceeded the degree of confinement inherent in the commission of the sexual abuse. We arrive at this conclusion because we believe the jury could have found the confinement in this case substantially increased the risk of harm to Horning and significantly lessened the risk of detection.

After McGrew sexually abused Horning a second time she lay awake and remembers McGrew moving about her bedroom. Specif-

ically, she recalled McGrew getting up from her bed, walking around, and sitting back down on her bed approximately thirty times, which would consume considerable time. Horning believed McGrew possessed a weapon of some kind. The evidence showed McGrew possessed a loaded shotgun and a knife. The note McGrew scribbled out expresses through innuendo a possible intent to kill Horning. Under the circumstances confronting Horning in trying to escape, we believe a jury question was presented on whether this type of confinement substantially increased her risk of further harm.

We have said: "The State does not need to present evidence of what confinement or removal normally exists with sexual abuse." *Hatter*, 414 N.W.2d at 338.

Moreover, the secluded location in which McGrew chose to commit the sexual abuse not only lessened the risk of detection for McGrew, but also further increased the risk of harm to the victim. *See* Kanellis, 67 Iowa L.Rev. at 796. Choosing the seclusion of his victim's own bedroom as the situs of the offense lessened the risk of detection for McGrew. However, that seclusion also increased the risk of harm to Horning because McGrew, with his victim secluded, was free to deal with her as he wished. *See Commonwealth v. Hughes*, 264 Pa.Super. 118, 399 A.2d 694, 698 (Ct.1979).

We noted in *Rich* that the binding of the victim's hands behind her back was not necessary to the commission of the sexual abuse and is not a normal incident of that offense. *Rich*, 305 N.W.2d at 745–46. McGrew bound Horning's hands behind her back and taped her mouth. The fact that the offense occurred in Horning's own home in the middle of the night increased her risk of harm and lessened the risk of detection because it would take the passage of considerable time before neighbors, most of whom likely were asleep, would suspect the occurrence of criminal activity. In this case, Horning did not escape until more than four hours elapsed from the time McGrew awoke her in her bedroom and well after the sexual assaults ended. We find these circumstances are such that a rational factfinder could find that the risk of detection of the sexual abuse

crime was significantly lessened as well as that the risk of harm was substantially increased. Either finding would support a conclusion that the period of confinement exceeded that normally incidental to the sexual abuse crime committed in this case. *See id.*

In *Mead*, we said:

We are impressed by the distinction between "seizure" and "detention" (which the court equated to confinement) drawn by the court in *Hardie v. State*, 140 Tex.Cr. 368, 377, 144 S.W.2d 571, 575 (1940). The present case involves a seizure of Mrs. Zamora by defendant, not a confinement of her. Under the statute, kidnapping cannot be predicated on merely "seizing" another person.

*Mead*, 318 N.W.2d at 445. In the case at bar, McGrew's confinement of Horning was vastly more than a "seizure."

Finally, we note the facts in this case regarding confinement are much more compelling in favor of upholding the kidnapping conviction than the facts in the two cases in which we have reversed such convictions. *See Marr*, 316 N.W.2d at 177–78; *Mead*, 318 N.W.2d at 441–42. In both *Marr* and *Mead*, the duration of the confinement lasted no longer than the time required to commit the underlying offenses. We believe the facts of this case are more similar to our courts' previous decisions upholding kidnapping convictions predicated on an underlying sexual abuse offense. *See Rich*, 305 N.W.2d at 740–41; *State v. Tryon*, 431 N.W.2d 11, 12–13 (Iowa App.1988).

The defendant's conviction for kidnapping is affirmed.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.**